Whitaker, Judge,
delivered the opinion of the court:
Plaintiffs, claiming to be the owners of a patented process for manufacturing titanium, sue to recover royalties on the use of that process. They claim that defendant, by virtue of its seizure of the assets of Siemens & Halske, a German corporation, under the authority of the Trading With the Enemy Act, succeeded to the contractual obligations of that corporation, which had agreed to pay the inventor a royalty in return for an exclusive license to use the patent and to permit others to do so. Plaintiffs say that, from August 1, 1951 to June 25, 1957, defendant, by its own agencies and through contracts with private business concerns, caused the *307 production of a large quantity of titanium by the patented process, and that this was done through the exercise of the exclusive license. Hence, they say, defendant is obligated to pay royalties in accordance with the terms of the exclusive license.
This case is before us for the second time. In Carey, et al., v. United States, 149 Ct. Cl. 587, 276 F. 2d 385 (1960), we held that plaintiffs were entitled to maintain this action against defendant for contractual royalties arising from defendant’s use, either by itself or by its sublicensees, of the Kroll process of producing titanium. We remanded the case to our Commissioner to determine: (a) a proper royalty under the contract; (b) whether all the titanium was produced under the exclusive license or all or a part under sublicenses granted by the exclusive licensee; and (c) the total amount of production by the patented process.
Dr. Wilhelm Kroll, a metallurgist and inventor, was a citizen of Luxembourg, where he had a private laboratory. On March 26, 1934, Kroll entered into a contract with a German corporation called Siemens & Halske (hereinafter referred to as S&H) under which he was to collaborate with S&H on certain metallurgical processes. The agreement provided that S&H was to receive an exclusive license on 'any patentable invention developed by Kroll and that S&H would also have the right to grant non-exclusive sublicenses. The royalty rate payable was to be computed “depending on the importance of the invention.” Any royalties paid by sublicensees were to be divided equally between the parties.
In 1936, Kroll developed a process for producing titanium. This process was within the scope of the 1934 agreement. On June 25, 1940, Kroll secured the issuance of United States Letters Patent No. 2,205,854 on his invention.
Titanium-bearing ore is relatively abundant, but prior to Kroll’s invention refined titanium was brittle and unworkable because of its high oxygen content. Kroll’s purpose was to eliminate the oxygen. Simply stated, his method for refining titanium from titanium-bearing ore was to heat a titanium halide, such as titanium tetrachloride, in a crucible in combination with an alkaline earth metal. An inert gas *308 was introduced into the crucible to exclude air. The resultant chemical reaction produced relatively pure titanium; magnesium chloride contamination was washed away with water. This method of refining titanium was a “batch” process: after the end-product was removed from the crucible, the crucible was cleaned and used to produce a new batch of titanium.
With certain refinements necessary to develop Kroll’s small-scale process to the point where the output was large enough to justify commercial exploitation, it is the method in use today. These refinements were the result of technical studies begun in 1938 by the United States Bureau of Mines. Attempts to develop a continuous production process or to refine commercially useable titanium by other methods, such as an electrolytic process, proved unsuccessful.
After the Second World War broke out and the Germans overran and occupied Luxembourg, the Alien Property Custodian, acting pursuant to Section 12 of the Trading With the Enemy Act, 40 Stat. 411, 423 (1917), 50 U.S.C. App. § 12 (1958), “vested”, i.e. took title to, Kroll’s patent. The statute permitted the Custodian to do so upon a finding that Kroll was an enemy alien or resided in enemy-held territory. The Custodian ezued in so finding: Kroll had come to the United States in February of 1940, prior to the vesting. In 1947, Kroll instituted a suit against the Alien Property Custodian in the United States District Court for the District of Columbia under section 9a of the Trading With the Enemy Act, claiming his patent was not subject to seizure by the Custodian. The District Court held that, inasmuch as Kroll was neither an enemy alien nor in enemy-held territory at the time of the vesting, he was entitled to the return of his patent, but that, since S&H was an enemy alien, the Attorney General, who had succeeded the Alien Property Custodian (Exec. Order No. 9788, 11 Fed. Keg. 11981 (1946)), could retain that firm’s rights under the 1934 agreement. The judgment, which was affirmed in Kroll v. McGrath, 199 F. 2d 187 (D.C. Cir. 1952), also provided that the parties should negotiate a proper royalty for sublicenses, but that, if they failed to do so within 30 days, the court would set the rates. The parties could not agree. Accordingly, on December 1, *309 1953, the District Court made an order setting a royalty rate, retroactive to April 3, 1951, of 5 percent of the gross sales price of the first 50,000 pounds of titanium produced by any sublicensee under the patent claims, 3 percent on the next 50,000 pounds, and 1 percent on all production in excess of 100,000 pounds. The order also provided that any sub-license issued by defendant must provide that one-half of the royalties should be paid directly to Kroll.
So far as appears from the record before us, neither party appealed from the order fixing the royalty rate or asked the court to modify it.
The Attorney General thereupon transferred title to the patent to Kroll, but retained the rights of S&H under the 1934 agreement.
Before discussing the Commissioner’s report on the matters referred to him, we shall dispose of the defendant’s defense, that these plaintiffs have not adequately proved that they acquired Kroll’s rights. The evidence adduced at the trial, however, amply substantiates plaintiffs’ claim to ownership of the patent. It shows that Kroll assigned his rights to a Nevada corporation that dissolved. The plaintiffs herein, being all of the shareholders of that corporation, became joint owners of Kroll’s patent rights as a result of the dissolution. According to the transcript and the exhibits, defendant, on many occasions, treated with plaintiffs and their predecessor corporation as owners of the patent. In the absence of any countervailing proof, these admissions have sufficient evidentiary weight to establish plaintiffs’ ownership and right to sue. Consequently, we think defendant’s contention is not well taken.
After World War II ended, it became clear to various Government officials that the advent of military jet aircraft made expansion of existing titanium facilities well-nigh mandatory. Titanium alloys combine a favorable strength-weight ratio with a high melting point. They are, therefore, vital in the construction of high performance jet aircraft, particularly in airframes and jet engines, where aluminum is not an adequate lower-cost substitute. The Bureau of Mines had constructed a pilot plant for producing titanium *310 through, the Kroll process. Various private concerns were invited to examine this facility to encourage them to develop similar facilities of their own. After the Korean War began, the need for large-scale production of titanium became even more critical.
In the consideration of this case it is necessary to keep in mind that some of the Government’s actions affecting the production and sale of the titanium here involved have been in its character (1) as the successor to the rights of S&H under the contract with Dr. Kroll, and (2) as the sovereign. We must exclude from our consideration whatever it may have done as sovereign and consider only its rights and liabilities as the successor of S&H.
As such successor it had all the rights of an exclusive licensee of the Kroll patent, which meant that it had the right to produce titanium by using the Kroll patent, to use the titanium so produced, and to sell it. For the exercise of this right it was obligated to pay to Kroll a royalty “depending on the importance of the invention.” It also had the right to grant sublicenses. For titanium produced by the Kroll process by a sublicensee, the sublicensee was obligated to pay one-half of the stipulated royalty to Kroll and one-half to the United States, as the successor of S&H, the exclusive licensee.
Beginning in 1951, defendant entered into a series of contracts with private manufacturers under which these producers would construct or expand facilities for producing titanium by the Kroll process. The licenses that were subsequently issued to implement these contracts provided for the payment of royalties by the manufacturers, in accordance with the rate fixed in the 1953 District Court order above referred to, with one-half of the royalty to be paid to the owners of the patent and the other half to the defendant. The parties agree that, during the period here involved, these various producers paid $1,786,083 to Kroll and his successors in title and a like amount to the United States. No royalty was ever paid to the patent owners on the titanium produced by the Bureau of Mines.
*311 These production contracts are the principal concern of this case. Defendant says that they were made pursuant to S&H’s contractual right to grant sublicenses under which the patent owner was entitled to one-half of the royalty and the exclusive licensee the other half, and that plaintiffs are not entitled to more than what they have already received, except, perhaps, for payment on account of the Bureau of Mines’ output. Plaintiffs, on the other hand, contend that the manufacturers produced titanium on behalf of the Government and completely for its purpose. Therefore, they conclude that the production by the contractors was production by defendant itself and, hence, defendant is bound to pay the full royalty to the owners of the patent.
There were a total of eleven separate agreements made with five domestic producers, but the contracts appear to have followed a set pattern. At the outset, the contracts provided that the contractor would construct titanium facilities or, in the case of one producer, expand its then-existing facilities so that it could achieve and maintain a stated minimum capacity. This expansion and new construction were financed in whole or in part by Government loans under the Defense Production Act of 1950, 64 Stat. 798, 50 TJ.S.C. App. §2061 (1958), section 302 of which authorized the President to make loans to private business enterprises for the expansion of capacity in the production of vital metals and minerals in order “ [t] o expedite production and deliveries or services to aid in carrying out Government contracts for the procurement of materials or the performance of services for the national defense * * *” The contracts also gave the Government a right of first refusal to purchase all or a specified portion of the contractor’s output. As to any balance remaining after the Government’s exercise of its option, or in the event there was no such exercise, the contractor was required to offer its titanium on the open market. After this offer was made, the Government was obligated to purchase any residue that remained unsold. In the event of a sale to the Government, either through the right of first refusal or by way of a required purchase, the *312 price would be the lower of the then-current market price for titanium or a specified figure that varied from contract to contract, from a low of $3.95 per pound in one to a high of $5 per pound, the most frequent amount.
After production under these initial contracts was underway and the loans had been repaid, the Government entered into supplemental agreements with most of the producers. Under these agreements, the Government was bound, at the option of the contractor, to purchase not more than a specified quantity of the output at a price equal to the lower of the market price or a stated figure, which was somewhat lower than the price fixed in the original contract.
Defendant also made contracts under which it licensed two Japanese concerns to manufacture titanium with the Kroll process. Then, acting through the Commodity Credit Corporation, defendant agreed to purchase all of the output of these foreign manufacturers in exchange for surplus agricultural commodities.
As a result of these arrangements, there was commercially produced 85,531,953 pounds of titanium between August 1, 1951, when the first contract was signed, and June 25, 1957, when the Kroll patent expired. Of this amount, the defendant purchased 32,707,537 pounds for its stockpile, or, 38.2% of the total production, at an average price of $4.05 per pound. The Government did not exercise its right of first refusal under any of the agreements, but purchased the residue in the hands of the producers after they had sold all that they could sell on the open market. In addition to the 32,707,537 pounds purchased by the Government, the Bureau of Mines also produced 492,513 pounds, all but a small amount of which the Government put in its stockpile. The balance of 52,824,416 pounds was sold primarily to persons having contracts to manufacture jet airplanes for the United States.
Until May 1954, the titanium producers were privileged to sell their product to anyone who would buy it, but the manufacturers of jet airplanes for the United States were practically the only people in need of titanium at that time. However, in May 1954 the Business and Defense Services *313 Administration issued an order, pursuant to sections 101 and 102 of the Defense Production Act of 1950, supra, requiring producers of titanium to channel all of their output to defense contractors in accordance with allocations and priorities set up by this agency. But practically all of their output had been going to such contractors anyway, because they were the only ones in the market for it.
It must be held that all of the titanium purchased by defendant under its contracts with the producers, obligating it to purchase all the titanium which they could not sell on the open market, was produced under defendant’s exclusive license to produce, use, and sell. Such a license is not restricted to production by the licensee personally or use by him personally or sales by him personally. It permits him to employ others to assist him in the production, and in the use and in the sale of the invention. Nor need he take any personal part in the production. A licensee having the right to produce, use and sell might be interested only in using the article or in selling it; in order to use it or sell it, the article must be produced; to have it produced, his license permits him to engage others to do all the work connected with the production of the article for him. Production of the article for the use of the licensee is production under the license.
Not so under a sublicense, unless the sublicensee is producing for the original licensee. To produce for his own use or for the use of someone else, the sublicensee may do so only under a sublicense. So the test is, whether the production is by or for the use of the original licensee or for the sublicensee himself or for someone else.
Kroll granted a license to. S&H to produce, use and sell titanium at a stipulated royalty. He also granted S&H the right to license others to produce, use and sell on a royalty arrangement whereby Kroll only got one-half of the royalty and the original licensee one-half. The parties of course intended that where the production was for the use of the original licensee it called for full royalty. It was only where the production was for the use and benefit of another that Kroll got one-half royalty and the original licensee, one-half. *314 To' tlie extent that tbe Government bought the titanium for its own use, it is liable for the full royalty. This amount was 32,707,537 pounds. In addition, the defendant itself, through its Bureau of Mines, produced 492,513 pounds, making a total of 33,200,050 produced by or for the defendant.
However, 52,824,416 pounds were sold by the sublicensees on the open market for their own account at whatever price they could get for it. Such sales were not to or for the defendant. They were sales authorized by the sublicenses. They could not have been made except for the sublicenses. The contract required that the royalty on such sales be divided between the patent owner and the licensee. That has been done.
It matters not that all but a small amount not sold to the United States was sold to manufacturers under contract to make jet aircraft for the United States. That the greatest part of the titanium was so sold was because these manufacturers were almost the only people in the United States in the market for titanium, since, at that time, very few, if any, jet airplanes were being produced for private use. But, whatever the reason, the sales were made by the private titanium-producing companies to private airplane manufacturing companies as the result of private negotiations in which defendant took no part. The United States was not a party to the contracts. If either party defaulted, the United States was in no, way liable. If a profit was realized, the producer got it; if he lost money, he had to stand the loss. It is true the defendant’s agreement to take the unsold titanium off the hands of the producer at a stipulated price fixed a floor on the price the airplane companies had to pay, but this was only an incidental effect of the Government’s agreement with the titanium producer. Other than this, the defendant influenced in no way the negotiations between the producer and the purchaser.
After the loans had been repaid to defendant, it was obligated to take no more than a specified amount of the production ; the balance the producer had to sell on the open market, taking the risk of loss, if any, and enjoying the profit, if any.
This was the situation until May 1954 when, pursuant to *315 the Defense Production Act, allocations and priorities in the disposition of titanium were set up, resulting in the manufacturers of airplanes for the defendant getting practically all of it. This, however, does not affect the contractual rights and liabilities of the parties because this was an act in the Government’s capacity as the sovereign, and not as contractor. Of. Deming v. United States, 1 Ct. Cl. 190 (1865); Jones & Brown v. United States, 1 Ct. Cl. 383 (1865); Horowitz v. United States, 267 U.S. 458 (1925), affirming 58 Ct. Cl. 189 (1923) ; Froemming v. United States, 108 Ct. Cl. 193 (1947), and cases there cited; Anthony P. Miller, Inc. v. United States, 161 Ct. Cl. 455 (1963), cert. denied, 375 U.S. 879.
Of course the defendant’s act of lending the producer money to equip his plant for the manufacture of titanium by the Kroll process and the agreement to take the unsold output at a stipulated price did not make the producer the Government’s agent in the production of titanium. The defendant loaned the producer the money; it did not invest it in its business. If the producer made money, it got all the profits; if it lost money, the defendant bore no portion of the loss.
It may, at first blush, seem strange that defendant should have to pay the patent owner full royalty on the titanium it stockpiled and not only pay nothing on the titanium that went into its airplanes but, instead, get one-half of the royalty on it. But it must be remembered that the defendant is the successor to the rights of S&H, a German corporation. Kroll required this corporation to pay full royalty on the titanium it itself manufactured or had someone manufacture for it; but he was willing to get only one-half of the royalty produced under a sublicense and let S&H get the other half, for the obvious purpose of stimulating the production of titanium. The more the production, the greater the royalties.
The United States succeeds to these rights, all of them, and to no less than these rights. It pays full royalty on the 33,200,050 pounds produced by or for it. On the 52,824,416 Kroll nets one-half and defendant one-half.
*316 The parties agree on tlie total quantity produced but they disagree on the question of a proper royalty under the contract. The agreement between Kroll and S&H expressly left this matter for future determination; Article 5 provides that “The amount of the royalties to be paid by S&H [sic] to Dr. Kroll is to be computed depending on the importance of the invention. * * *”
Our Commissioner, acting pursuant to the terms of the reference, heard testimony and received other evidence pertaining to the proper amount of a royalty for use of the Kroll process. He found that the graduated 5-3-1 percent royalty rate fixed by the District Court in 1953, when applied to the prices received by defendant’s licensees throughout this period, produced an average royalty of 1.14 percent. He concluded that this royalty rate was a proper one, considering “the importance of the invention,” and should be applied to all production during the relevant period, even though such production was pursuant to defendant’s exclusve license. Both parties have taken issue with the Commissioner’s determination. Plaintiffs say the 1.14 percent rate is too low; defendant says it is excessive.
So far as the royalty to be paid by sublicensees is concerned, that question has been settled by the decision of the District Court, supra, by which the parties are collaterally estopped. The present plaintiffs are the successors in title to Dr. Kroll, and McGrath was at the time the Attorney General of the United States. Cf. Commissioner v. Sunnen, 333 U.S. 591, 601 (1948); Bander v. United States, 161 Ct. Cl. 475, 481-82 (1963). But it is not determinative of the royalty to be paid by the exclusive licensee, although it is quite persuasive. If this is the royalty to be paid 'by the sublicensees, as we must hold it was, we can think of no good reason why it is not also the royalty to be paid by the original licensee. The Commissioner took into consideration the importance of the invention, the money spent to adapt it to commercial use, the uncertain state of the market for titanium, the conflicting testimony of the experts, and came to the conclusion that the rate fixed by the District Court should also *317 be applied to the titanium produced for or by the original licensee. We agree with his conclusion.
Defendant has interposed a counterclaim based upon the fact that plaintiffs received royalty payments on titanium produced before June 25,1957, the date when the Kroll patent expired, but sold after that date. Defendant maintains that plaintiffs were not entitled to receive 'any payments on sales of titanium subsequent to the expiration date of the patent, and it wants plaintiffs to turn over any royalties paid on such sales. This is an action on a contract, and defendant’s rights and liabilities are derived therefrom. Under that contract, the patentee has the right to royalties on titanium production as long as his patent subsists. It is immaterial that the sale came after the patent expired, although the amount of the royalty is measured by the ultimate sale price. Defendant’s contention, therefore, considered either as a counterclaim or as a partial defense, is not well-taken.
Since this is a contract action and not an infringement suit, plaintiffs’ claim for interest must also fall. There is nothing in the contract, upon which the plaintiffs sue, that expressly obligates S&H or its assigns to pay interest in addition to the royalty. Under the provisions of 28 U.S.C. §2516(a), therefore, plaintiffs are not entitled to recover interest.
The licenses which defendant issued to the several producers of titanium provided that half of the royalty, at the rate we have found to be proper, would be paid to the owners of the Kroll patent and the other half would go to defendant. That was done, and each of the parties received $1,786,083. On this production defendant is not otherwise liable. Of the total amount of titanium that defendant acquired, it obtained 32,707,537 from its commercial producers. Application of the 1.14 percent royalty rate and the average $4.05 price per pound to this figure produces a total royalty of $1,510,106.98. The owners of the patent received $1,786,083 from the producers, but only 38.2 percent of this amount, or $682,283.71, was applicable to the titanium which went to defendant’s stockpile. Deducting the $682,283.71 which the *318 patent owners have heretofore received from the $1,510,106.98 that they are owed on account of commercial production produces a difference of $827,823.27. In addition, plaintiffs are entitled to a royalty on the output of the Bureau of Mines. The Bureau produced 492,513 pounds of titanium under the Kroll process. Since the average price paid by defendant during the period in question was $4.05 per pound, the Bureau’s production had a value of $1,994,677.65. Application of the 1.14 percent royalty rate to this sum produces a royalty of $22,739.33 to be added to the $827,823.27 due on account of commercial production.
Plaintiffs are entitled to recover $850,562.60, and judgment will be entered in their favor for this amount.
Defendant’s counterclaim will be dismissed.
FINDINGS OP PACT ■
The court, having considered the evidence, the report of Trial Commissioner Donald E. Lane, and the briefs and argument of counsel, makes findings of fact as follows:
1. This is a contract suit under Title 28 IJ.S.C. § 1491 for royalties due plaintiffs under a contract. The contract relates to the development of new processes and apparatus for the separation and refining of metals. On April 6,1960,149 Ct. Cls. 587, the court denied plaintiffs’ and defendant’s motions for summary judgment, concluded that the United States is the proper party defendant in this suit, and remanded the case to the commissioner for the purpose of taking evidence upon:
A. What, in the circumstances here present, would be a proper royalty, depending upon the importance of the Kroll invention relating to a process for the production of the metal titanium.
B. The facts and circumstances in relation to the Government’s contracts with the several producers of titanium.
C. The amount of production of titanium by the United States and by the several manufacturers under their contracts with the United States.
Both parties have presented testimony and documentary evidence relevant to the above three subjects.
*319 2. The Kroll invention relates to a method of producing titanium and titanium alloys. The invention is described in United States Letters Patent No. 2,205,854 issued to Wilhelm Kroll on June 25, 1940. The patented Kroll method provided a process for the production of ductile titanium metal by chemically reacting in a crucible a titanium halide, such as titanium tetrachloride, with an alkaline earth metal, such as magnesium, at an elevated temperature below the boiling point of the metal, 1070° C., and in the presence of a protective gas, such as argon, while maintaining normal pressure. The Kroll patent further discloses that at the end of the chemical reaction, the crucible content may -be bored out, treated with water to remove magnesium chloride, and then treated with dilute hydrochloric acid.- The resulting titanium chips are pulverized, rinsed, etched, washed and dried. The resulting titanium powder is then heated under a high vacuum at 500°-700° C. and pressed into compact briquets. The briquets may 'be sintered under high vacuum closely below the melting point, or the titanium may be solidified by being fused in a suitable crucible. Various details and variations are described in the Kroll patent specification. The equipment illustrated in the Kroll patent drawings is a laboratory-type apparatus said to have produced 269 grams of titanium during the described cycle of operations.
3. Titanium is the fourth most abundant structural metal in the crust of the earth. There are abundant deposits of titanium containing ore on the North American Continent. The mineral occurs generally as ilmenite, a titanium-iron-oxygen-bearing ore, or as rutile, a titanium-oxygen-bearing ore. Titanium compounds have been used in the paint pigment industry for many years. Titanium metal is relatively strong, lightweight, and corrosion-resistant. Titanium alloys possess a strength-weight ratio superior to that of either aluminum or alloy steel in intermediate temperature ranges. High temperature-resistant metals and alloys are required in jet engines.
4. Within the period 1923-1940, Kroll operated his own private laboratory in Luxembourg where he did experimental work and research on various metals. He received royalties on various patents and had contracts with Siemens *320 & Halske Aktiengesellschaft. Kroll produced titanium in his laboratory by the methods disclosed in the ’854 patent at least as early as 1938.
5. Between 1938 and 1942, the United States Bureau of Mines conducted an investigation into the technology of titanium and made a critical survey and small-scale test of known methods of producing titanium. As a result of its survey and tests, the Bureau of Mines determined that the Kroll process would be the easiest to develop quickly for the large-scale production of titanium. An article authored by employees of the Bureau of Mines and published in 1946 by permission of the Director of the Bureau of Mines stated:
* * * After considering virtually every process proposed for the production of metallic titanium and investigating the Yan Arkel, Kroll, electrolytic, and several other processes, it was concluded that the Kroll process was the most practical for large-scale operations.
6. Dr. John P. Nielsen, plaintiffs’ expert, head of the Department of Metallurgic Engineering at New York University, specializing in titanium, defined the Kroll process as the reduction of titanium tetrachloride by the use of magnesium at an elevated temperature under controlled atmosphere or vacuum. He estimated that from 1948 to 1961, 98 percent or more of the titanium produced in the United States was produced by the Kroll process. He testified that attempts to develop a continuous process for producing titanium have been commercially unsatisfactory. Electrolytic processes were also unsatisfactory. Relatively small amounts of titanium have been produced by a sodium process developed by Union Carbide at Sandusky, Ohio. Dr. Nielsen testified that the Kroll process for producing titanium was comparable in importance with the Hall process for producing aluminum and with the Mond Nickel process for producing nickel. Dr. Wilhelm Kroll has received a number of awards and citations from major metallurgical societies in the United States and abroad.
7. A report on titanium dated May 25, 1955, by the Subcommittee on National Stockpile and Naval Petroleum Reserves of the Committee on Armed Services, United *321 States Senate, 84th Congress, 1st Session, plaintiffs’ exhibit 9 herein, includes the following statements :
In 1947, when the Bureau of Mines announced the availability of a commercial method for producing ductile titanium (the Kroll process), high temperature-resistant metals were crucially needed for jet engines. *****
The commercial production of titanium was begun in 1948.
The first sponge plants were built by the Bureau of Mines and E. I. du Pont de Nemours & Co., using the Kroll process. * * *
All commercial production of titanium today [1955] is by the Kroll process. Basically this involves the magnesium reduction of titanium tetrachloride at a red heat under an inert gas blanket.
The tetrachloride used in this process is produced by chlorination of titanium dioxide obtained from the two ores, ilmenite and rutile.
The Kroll process produces a commercially pure spongy metal known as titanium sponge.
$ $ ‡ ‡
Titanium sponge is consolidated into ingots by melting. The most successful process today involves a double melting, consumable electrode, vacuum process.
The resulting ingot is further worked into billet, bar, rod, sheet, and other basic mill shapes.
V. GOVERNMENT SPONGE PRODUCTION REQUIREMENTS
Since 1952, and until quite recently, the Department of Defense has been urging that domestic production of sponge be increased to 35,000 tons annually.
!]! $ <f*
8. The evidence clearly warrants a conclusion that the patented Kroll invention was of great importance during the 1946-1961 period.
9. A proper royalty for defendant’s use of the Kroll process for titanium depends on factors such as the royalty rates paid by others, the sums received by owners of the Kroll process, the price of titanium per pound, the number of pounds of titanium produced, and the availability of other processes for obtaining titanium.
*322 10. On March 26,1934, Kroll entered into a contract with Siemens & Halske Aktiengesellschaft (S & H) under which Kroll was to collaborate in the field of thermal and electro-thermal refining and metal production processes, the manufacture of alloys, etc. The contract provided that S & H was to acquire, with respect to any inventions and patents of Kroll resulting from such research, an exclusive license at a royalty rate to be computed upon the importance of the invention, and also the right to grant sublicenses. Any profits from the sublicenses were to be divided between both parties, share and share alike.
11. Kroll invented a process for manufacturing titanium within the field of his contract with S & H, and said process was patented in Germany in 1937. On June 25, 1940, Kroll obtained United States Letters Patent No. 2,205,854, noted in finding 2, on his method of producing ductile titanium.
12. There is no evidence that Kroll ever received from S & H royalties with respect to his titanium process here involved. Likewise, there is no evidence that the royalty rate was agreed upon by Kroll and S & H, or computed by arbitration or by resort to the City of Berlin law courts as provided for in paragraph 9 of the contract.
13. After Luxembourg had been invaded and occupied by the Germans, the Alien Property Custodian vested the Kroll patent on January 18, 1943. Unknown to the Custodian, Kroll had left Luxembourg and had come to the United States in 1940. When Kroll initiated action to obtain the return of his vested patent, the Custodian became aware of the existence of the contract between Kroll and S & H., involved in the present suit. The Alien Property Custodian vested the rights and interests of S & H under this contract on January 29, 1948. Under these circumstances, the Attorney General was prepared to return the Kroll patent to Kroll, but only subject to the rights and interests of S & H under the vested contract. Kroll refused and brought suit against the Attorney General in the United States District Court for the District of Columbia, for the full return of the Kroll patent under the Trading With the Enemy Act.
14. On April 3, 1951, the United States District Court held that the Attorney General, as successor to the Alien Property Custodian, was entitled to retain an exclusive *323 license in the Kroll patent, a right to snblicense others under the patent, a right to share equally with Kroll in the royalties from sublicensees, and a right to bring other actions to protect the patent. The District Court held that the royalty rates at which the Attorney General could grant sublicenses were to be agreed to by Kroll and the Attorney General or were to be set by a court order. The District Court further held that the Attorney General was to return to Kroll title to the Kroll patent subject to the rights and interests of the Attorney General specified above, and held that Kroll was to pay to the Attorney General one-half of the compensation already received by Kroll from E. I. du Pont de Nemours & Company for a release for past infringement of the Kroll patent. The judgment was affirmed on appeal in Kroll v. McGrath, Attorney General, 199 F. 2d 187.
15. On December 1,1953, the United States District Court authorized the Attorney General to grant sublicenses under the Kroll patent at the rate of 5 percent of the gross sales price of the first 50,000 pounds of titanium, in sponge, powder and ingot form, produced in accordance with the process claimed in the Kroll patent, at the rate of 3 percent on the next 50,000 pounds, and at the rate of 1 percent on all in excess of 100,000 pounds. The court order provided that the above 5-3-1 percent rates applied to production after April 3,1951, and that each licensee should pay one-half of said sublicense royalty direct to Kroll. Kroll v. Herbert Brownell, Jr., Attorney General, Civil Action 4845 — 48 (defendant’s exhibit 13 herein).
16. During the period November 15, 1954, through February 15, 1957, the Assistant Attorney General, as Director, Office of Alien Property, and as licensor, granted nonexclusive sublicenses under the Kroll patent, at the 5-3-1 percent royalty rates noted in finding 15, to each of the following nine companies:
Crane Co.
Cramet, Inc.
Titanium Metals Corp. of America
E. I. du Pont de Nemours & Company
Daiichi Bussan Kaisha, Limited
Wah Chang Corporation
*324 Philipp Bros. Inc., Philipp Bros. Inter-Continent Corp. and Philipp Bros. Ore Corporation
Mitsubishi International Corp.
The Dow Chemical Company
17. Kroll assigned all of his patent rights to, Titan Metals Corporation, a Nevada corporation. The name of Titan Metals Corporation was subsequently changed to Vista Corporation. Vista Corporation has been dissolved. The plaintiffs herein were all of the stockholders of Vista, and they acquired Kroll’s patent rights by virtue of the dissolution. As a result, plaintiffs are the owners of this claim and have the right to bring this action.
18. The sublicenses granted to the companies listed in finding 16 provided that one-half of the royalties were to be paid to Titan Metals Corporation, later known as Vista Corporation, assignee of the Kroll patent. Four of these sub-licenses bear the consent and approval of Vista Corporation by officers thereof, including at one time or another Henry A. Carey, Edwin D. Hicks, and Joseph Schulein, plaintiffs in the present case. It thus appears that Vista Corporation, as owner of the Kroll patent, willingly accepted from sub-licensees royalties at the 5-3-1 percent rates. The nonexclusive sublicenses granted by the defendant make no reference to any production of titanium for the defendant.
19. The Defense Production Act of 1950 declared that circumstances required the diversion of certain materials and facilities from civilian use to military and related purposes and required the expansion of production facilities beyond the levels needed to meet civilian demands. Pursuant to this authority, the defendant entered into a series of contracts with commercial titanium producers. These contracts provided for the construction of additional production capacity, provided in some cases substantial loans for such construction and provided for the purchase of titanium sponge by defendant. Under certain contracts, the Government could require that some or all of the titanium sponge produced be sold to the Government. Under other contracts, the contractor could require the Government to purchase titanium which the contractor was unable to sell in the open market. Certain provisions of these contracts are summarized in the following Table A.

*325

*326 20. A summary of the basic provisions of the various contracts is as follows:
1. Titanwm Metals Corporation.
(a) Contractor shall produce and dispose of 18,000 short tons and maintain production at 3,600 short tons per year.
(b) Facilities shall be completed by October 1, 1954.
(c) The Government may require the contractor to sell 400 short tons per year to it or for its account each year.
(d) Contractor shall offer to industry or use for fabrication all titanium not purchased by the Government.
(e) As to any amount on hand after sales pursuant to (c) and (d), the Government may buy up to 3,600 short tons per year (900 short tons per quarter).
(f) Contractor may give the Government any unsold titanium in payment of the Government’s loan.
(g) The price to the Government will be the lower of $4.72 per pound or the fair market value as stated in trade journals.
(h) The Government will loan up to $15,000,000.
2. Du Pont Corporation.
(a) Contractor will deliver up to 1,000,000 pounds at the option of the contractor at a rate of 150,000 pounds per month.
(b) The price to the Government will be $5.00 per pound.
3. Du Pont Corporation.
(a) Contractor will construct additional facilities capable of producing 13,500 short tons per year if orders exceed present capacity.
(b) If orders fall below 260 short tons per month, the Government must buy the excess production or the contractor may halt production.
(c) The Government may buy up to 75 short tons per quarter.
(d) Contractor will offer on the open market all production not purchased by the Government.
(e) If any titanium is not purchased on the market or by the Government, the contractor may deliver up to 675 short tons in satisfaction of the Government’s loan.
(f) The price to the Government will be the lower of $5.00 per pound or the fair market value as stated in trade journals.
(g) The Government will advance up to $14,700,000.
*327 4. Titanium Metals Corporation.
(a)At the option of the contractor, the contractor may sell up to 1,250,000 pounds to the Government at $5.00 per pound.
5. Cramet, Inc.
(a) The contractor will build facilities capable of producing 6,000 short tons per year.
(b) The Govermnent may buy 25 percent of the monthly production or 125 tons per month, whichever is lower.
(c) The contractor must offer the unsold balance to industry at $5.00 per pound in the first year and $4.00 per pound thereafter.
(d) The contractor may tender to the Government and the latter must buy any unsold titanium up to 6,000 short tons per year, at a rate not in excess of 1,500 tons per quarter.
(e) The price to the Government will be that set forth in (c).
6. Du Pont Corporation.
(a) The contractor, at its option, may sell, and the Government agrees to buy, up to 1,250,000 pounds of titanium by June 30, 1954.
(b) The price shall be the lower of the contractor’s quoted price to industry, the market price or $5.00 per pound.
7. Titanium Metals Corporation.
(a) The contractor, at its option, may sell, and the Government agrees to buy, up to 600,000 pounds of titanium by June 30, 1954.
(b) The price shall be the lower of the contractor’s quoted price or $4.72 per pound.
8. Dow Chemical Corporation.
(a) The contractor will build a plant with a capacity of 5 short tons per day.
(b) The Government may buy all of the contractor’s output.
(c) The amount which the Government does not buy will be offered on.the open market at a price not less than the market price on the first 6,030 pounds per month and $5.00 per pound on the balance but, in any event, not more than the contractor’s quoted price.
*328 (d) The Government agrees to buy any amount left unsold at the price specified in (c).
9. Cramet, I no.
(a)The contractor, at its option, may sell, and the Government agrees to buy, up to 60,000 pounds by June 30,1955, at a price equal to the open market price.
10. Wall Chang Corporation.
(a) The Government may buy up to 50 percent of contractor’s output.
(b) Any titanium not sold to the Government will be offered to industry.
(c) If any balance remains unsold, the contractor may deliver, and the Government agrees to buy, up to 18 short tons per quarter.
(d) The price to the Government will be the lower of the contractor’s quoted price, the market price or $3.95 per pound.
11. Phillips Bros. Ore Corporation.
(a) The contractor will deliver to the Commodity Credit Corporation titanium manufactured by Japanese concerns in exchange for surplus agricultural commodities worth the equivalent of $3.95 per pound of titanium.
21. Contract DMP-6 specified additional facilities including additions to the existing titanium tetrachloride facilities. Contract DMP-75 specified in Article VI that the prices set forth were “to be increased by the amount of any increase in royalty payments for the use of the Kroll process over that set forth” in Appendix B, which recites the 5-3-1 percent royalty rates.
22. The several contractors listed in Table A, excepting the U.S. Bureau of Mines, are included in the group of companies to which the Assistant Attorney General granted a nonexclusive sublicense under the Kroll patent. The parties have stipulated that the production of titanium by those companies which were sublicensed by the Attorney General was production under the Kroll process.
23. During the life of the Kroll patent, the sublicensees and the U.S. Bureau of Mines produced and sold titanium sponge in amounts summarized in the following Table B.
*329 Table B
Producer Lbs. sold Price Lbs. to Govt. Price
Titanium Metals Oorp, — . 33,646,338 $117,674,126 5,364,155 $23,288,356
1,505,992 6,159,500
E. I. du Pont de Nemours & Company____ 29,124, 108,082,636 5,283,600 23,571,996
367,200 1,517,760
Cramet Inc. 9,484, 41,113,867 48,000 7,588,800 189,600 34,113,444
The Dow Chemical Co_ 2,574, 10,284,105 1,958,570 9,534,141
Wah
Bros. 4,481, 15,375,468 4,456,604 15,321,588
Daiicbi Bussan Kaisha, Ltd.... 5,988, 18,645,836 5,988,003 18.645,836
Mitsubishi International Oorp.. 60,939 14,613 50,939
Crane Company.. 3,500
Totals. United States Bureau of Mines. 85,531, 492, 311,950,452 32,707,537 492,513 132,876,460
24. Table B indicates that the defendant actually acquired approximately 38.2 percent of the titanium sponge produced under the several contracts resulting from the Defense Production Act of 1950, and that the defendant paid the equivalent of about $4.05 per pound for said titanium. Plaintiffs contend that these transactions involved production for the defendant. Defendant contends that these transactions involved a “put and call” procedure under which the producer could require the defendant to purchase a portion of his production and under which the defendant could call on the producer to sell a portion of his production to the defendant. Much of the titanium production not acquired by the defendant was sold by the producer to various manufacturers on defense-rated orders for use in the manufacture of equipment ordered and procured by the defendant.
25. Pursuant to the Defense Production Act of 1950, defendant’s Business and Defense Services Administration (BDSA) issued order M-107, effective May 19, 1954, requiring each producer of titanium products to report monthly on projected production of titanium for rated orders, and also requiring BDSA to issue directives to each producer covering his production of titanium products to fill defense-rated orders.
26. The Minerals Yearbook for 1957, prepared by the staff of defendant’s Bureau of Mines, indicates that over 98 percent of the titanium produced was for use of the defense *330 services. A portion of the titanium produced was stockpiled by the defendant.
27. The Bureau of Mines production of titanium under contract DMP-76 used an adaptation of the Kroll process. The Minerals Yearbook for 1953 indicates that the production of titanium by the Bureau of Mines was initiated in view of an anticipated future insufficiency of titanium for national defense.
28. The U.S. Bureau of Mines started experimenting with the Kroll process in 1942 at its Salt Lake City station, and subsequently constructed a pilot plant at Boulder City, Nevada. In developing apparatus for the production of titanium metal, employees of the Bureau of Mines used a mild steel crucible liner, added a spout to drain molten magnesium from the crucible, operated in a dry atmosphere, and adapted well-known vacuum distillation procedures to the Kroll process. The Bureau of Mines also sought to discover a satisfactory continuous process, as distinguished from the Kroll batch process, for producing titanium in large quantities, but was unable to find a suitable continuous process. The Bureau of Mines expended in excess of one million dollars in titanium research. In 1952 and 1953, the Bureau of Mines titanium program for Boulder City included improving details of the Kroll process, further search for a continuous process, a study of electrolytic and other production methods, and research on the production of titanium tetrachloride from ilmenite and titanium slags. The evidence does not warrant a finding or determination of a specific sum expended by defendant’s Bureau of Mines to adapt the Kroll process for commercial utilization. The Bureau of Mines pilot plant at Boulder City was made available to others for inspection and for research purposes, and was used for the latter purpose by Wah Chang Corporation, one of defendant’s contractors listed in Table A above.
29. A Department of Justice report and recommendations of the Attorney General to the President, entitled Investigation of Government Patent Practices and Policies, includes a monograph on the administration of patent rights vested by the Office of Alien Property Custodian (APC). *331 Said monograph states that under all patents formerly owned by “enemy-occupied” nationals, the APC during World War II negotiated a reasonable royalty starting with an offer of 5 percent or its equivalent of the net selling price of the product made under the patented process. The monograph indicates that the APC deemed it advisable to adopt the rate of 5 percent as being presumptively reasonable.
30. Prior to 1934, Kroll granted S & H exclusive rights in an invention in the beryllium metal field for a royalty rate of 4 percent, and exclusive rights to utilize the Kroll copper-titanium patents for a royalty rate of 5 percent.
31. Plaintiffs’ first expert on patent licensing, Lawrence J. Eckstrom, concluded that the proper royalty rate to be paid by an exclusive licensee under the Kroll process should be a minimum of 5 percent of the net selling price for the life of the patent. Plaintiffs’ second expert on patent licensing, Albert S. Davis, Jr., concluded that the royalty rate should be not less than 5 percent and that it probably should be 7.5 percent, and that an exclusive license normally calls for a higher royalty rate than a nonexclusive license.
32. Defendant’s expert on patent licensing, Eobert A. Lavender, concluded that a reasonable royalty rate for the exercise of an exclusive license under the Kroll process would be one-half of 1 percent (0.5%). Defendant’s second expert on patent licensing, Paul Wiegand, concluded that a reasonable royalty rate for an exclusive license under the Kroll process would be one-half of the 5-3-1 percent rates noted in finding 15. The parties stipulated that if defendant produced one Walter Deisinger as an expert on patent licensing, said Deisinger would conclude that a reasonable rate for the exercise of an exclusive license under the Kroll process would be one-half of 1 percent (0.5%) of the sales price. These opinions as to reasonable royalty rates for an exclusive license assert rates less than the sublicense rates of 5-3-1 percent set by the TJ.S. District Court.
33. Owners of the Kroll patent received $1,786,083 in royalties from the nine sublicensees listed in finding 16, and the defendant received a like amount. This payment of $3,572,-166 in royalties on sales of 85,531,955 pounds of titanium for *332 a total of $311,950,455 gives an average royalty rate of 1.14 percent on an average sale price of approximately $3.65 per pound. The payment of $3^ million in royalties by sub-licensees supports the conclusion noted in finding 8 that the Kroll invention was of great importance.
34. The average royalty rate of 1.14 percent of the sale price, based on the graduated 5-3-1 percent sublicense royalty rate authorized in 1953 by the TJ.S. District Court, is a proper royalty rate for application in the present case, considering the importance of the Kroll invention noted in finding 8 and considering the volume of titanium production summarized in Table B.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are entitled to recover in the amount of eight hundred fifty thousand five hundred sixty-two dollars and sixty cents ($850,562.60), and judgment will be entered to that effect.
Defendant’s counterclaim is dismissed.