# United States Court of Appeals for the Federal Circuit

2008-1502

COREBRACE LLC,

Plaintiff-Appellant,

v.

STAR SEISMIC LLC,

Defendant-Appellee.


Charles L. Roberts, Workman Nydegger, of Salt Lake City, Utah, argued for plaintiff-appellant. With him on the brief were L. David Griffin, Matthew A. Barlow, and Chad E. Nydegger. Of counsel on the brief was Mark E. Wilkey, Core-Brace, LLC, of West Jordan, Utah.

H. Dickson Burton, TraskBritt, PC, of Salt Lake City, Utah, argued for defendant-appellee. With him on the brief were Brick G. Power, and Casey K. McGarvey.

Appealed from: United States District Court for the District of Utah

Judge Dale A. Kimball

# United States Court of Appeals for the Federal Circuit

2008-1502

COREBRACE LLC,

Plaintiff-Appellant,

v.

STAR SEISMIC LLC,

Defendant-Appellee.

Appeal from the United States District Court for the District of Utah in Case No. 2:08-CV-11, Judge Dale A. Kimball.

_____

DECIDED: May 22, 2009

_____

Before LOURIE, FRIEDMAN, and PROST, Circuit Judges.

LOURIE, Circuit Judge.

CoreBrace LLC ("CoreBrace") appeals from the judgment of the United States District Court for the District of Utah dismissing its claims for breach of a patent license agreement and for patent infringement. See Corebrace LLC v. Star Seismic LLC, No. 2:08-cv-11, 2008 U.S. Dist. Lexis 55471 (D. Utah July 18, 2008). Because the court did not err in concluding that Star Seismic LLC's ("Star's") license to make, use, and sell the patented product carried with it an implied license to have the product made by a third party, we affirm.

BACKGROUND

CoreBrace owns U.S. Patent 7,188,452 ("the '452 patent"), which is directed to a brace for use in the fabrication of earthquake-resistant steel-framed buildings. On June

10, 2007, Star and the inventor of the '452 patent entered into a "Non-Exclusive License Agreement" ("License"), by which Star received a license under the '452 patent; the inventor later transferred his interest to CoreBrace. The License grants Star a nonexclusive right to "make, use, and sell" licensed products. It does not explicitly provide a right to have the licensed product made by a third party. The License does state that Star may not "assign, sublicense, or otherwise transfer" its rights to any party except an affiliated, parent, or subsidiary company. It also reserves to CoreBrace "all rights not expressly granted to [Star]." However, it provides that Star owns any technological improvements "by a third party whose services have been contracted by [Star]."

Star used third-party contractors to manufacture licensed products for its own use. CoreBrace contends that such use of third parties was a breach of the License because Star lacked the right to have a third party make products for Star. On January 4, 2008, CoreBrace sent a letter to Star stating that the License was terminated. The License provides that it can be terminated if it is breached, after written notice of the breach and after a thirty-day opportunity to cure. CoreBrace has not alleged that it provided notice of a breach or that it gave Star thirty days to cure such breach.

On January 4, 2008, the same day that it sent the termination letter, CoreBrace sued Star for breach of the License due to Star's use of third-party contractors and for patent infringement based on Star's use of patented products under a terminated License. Star moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim, and the district court granted Star's motion. The court held that Star did not breach the License by having third-party contractors make the licensed products.

According to the court, under Carey v. United States, 326 F.2d 975 (Ct. Cl. 1964), a patent licensee's right to "make" an article includes the right to engage others to do all of the work connected with its production. The court also relied on similar reasoning in Advanced Micro Devices, Inc. v. Intel Corp., 885 P.2d 994 (Cal. 1994). The court further reasoned that, even when a license prohibits sublicensing, as in this case, "have made" rights are granted unless they are expressly prohibited. The court distinguished Intel Corp. v. U.S. International Trade Commission, 946 F.2d 821 (Fed. Cir. 1991), as a case that was primarily about "foundry" rights, or a licensee's rights to make a product and sell it under a third party's name, and as having been based on the parol evidence of the parties' intent in that case not to grant such foundry rights. The court also examined the License and, based on its apparent acknowledgement of third-party manufacturers, concluded that nothing in the License precluded Star from having a third party manufacture the licensed product for Star. Thus, the court held that Star had the right to have a third party manufacture the licensed product for it.

The court then held that, even if Star had breached the License, CoreBrace did not properly terminate it because CoreBrace failed to follow the License's termination provisions. CoreBrace had conceded that it had not followed the termination provisions, but had argued that Star's breach of the License was incurable, so notice was not required prior to termination. According to the court, however, Star's alleged breach was not incurable, as CoreBrace could have notified Star that it should make the product itself, cease using a third party, or have the third party obtain a license. Such action, according to the court, would not have been impossible or futile. Furthermore, the court found that the alleged breach did not frustrate the purpose of the License, as

the inventor collected a royalty from Star on each product, no matter who manufactured it. Thus, according to the court, CoreBrace should have followed the prescribed procedure for terminating the License, and the failure to properly terminate it meant that Star retained its rights under the License.

Finally, the court held that, because the License was neither breached nor terminated, Star could not have infringed the patent under which it was licensed. CoreBrace timely appealed the district court's dismissal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION

CoreBrace argues that the district court erred in holding that the License was not breached. The License reserves to CoreBrace all rights not expressly granted, and, according to CoreBrace, the district court found that "have made" rights were not expressly granted. CoreBrace also asserts that "have made" rights are not inherent in the right to make, use, and sell, as a licensee can make the product itself rather than having it made by a third party. Thus, CoreBrace argues that Star did not have the right to have a third party make the products.

CoreBrace also argues that the court improperly distinguished Intel and relied on Advanced Micro and Carey to hold that a prohibition on "have made" rights must be explicit. According to CoreBrace, in Intel, this court held that "have made" rights were restricted by the reservation of rights clause in the license. CoreBrace asserts that Advanced Micro is inapposite because the ruling was on appeal from an arbitrator. CoreBrace also argues that Carey is inapposite because the exclusive license in that

case granted the right to sublicense, which, according to CoreBrace, includes the right to "have made."

Finally, CoreBrace argues that, although certain provisions in the License mention "third parties," the License also mentions specific third parties, not including third-party manufacturers. Thus, according to CoreBrace, the License would have mentioned third-party manufacturers if the parties had intended for such manufacturers to be permitted. Although the License mentions third parties in general whose services have been contracted for by Star, CoreBrace argues that those third parties might be architects, contractors, or others with a connection to Star, rather than manufacturers.

Star responds that the grant of a right to "make, use, and sell" inherently includes the right to have others make the product, as the Court of Claims held in Carey. Star also asserts that the facts of Intel differ from this case, as the question in Intel was whether the licensee could operate as a foundry, i.e., make the product for a third party and sell it under the third party's name. Moreover, according to Star, the decision in Intel was based on strong parol evidence and applied the law of a different circuit. Furthermore, Star argues that the California Supreme Court later concluded in Advanced Micro that "have made" rights are included in a license to "make, use, and sell" unless they have been expressly excluded.

Star also argues that the License specifically provides that Star may contract with third parties to exercise its rights, which necessarily includes contracting with third-party manufacturers. Moreover, according to Star, the License requires Star to provide its supply and service contracts for inspection, implying that such supply and service contracts, including manufacturing contracts, are permissible.

We conclude that in granting the 12(b)(6) motion the district court correctly determined that Star was entitled to have contractors make the licensed product and did not breach the patent license in doing so. "The question . . . whether a Rule 12(b)(6) motion was properly granted is a purely procedural question not pertaining to patent law, to which this court applies the rule of the regional [] circuit," in this case the Tenth Circuit. Gen. Mills, Inc. v. Kraft Foods Global, Inc., 487 F.3d 1368, 1373 (Fed. Cir. 2007) (quotation marks omitted). "Because the sufficiency of a complaint is a question of law, [the Tenth Circuit] review[s] de novo the district court's grant of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), applying the same standards as the district court." Sunrise Valley, LLC v. Kempthorne, 528 F.3d 1251, 1254 (10th Cir. 2008) (quotation marks omitted). "A complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief." Jones v. Bock, 549 U.S. 199, 215 (2007). The appropriate law for construing the terms of a contract is the law of the jurisdiction identified in the contract, in this case Utah law. See Rash v. J.V. Intermediate, Ltd., 498 F.3d 1201, 1206 (10th Cir. 2007).

Star did not breach the License by contracting with third parties to have the licensed products made for it. The right to "make, use, and sell" a product inherently includes the right to have it made by a third party, absent a clear indication of intent to the contrary. No Utah Supreme Court case has addressed the scope of a right to "make, use, and sell" a product. However, "[w]here the state's highest court has not addressed the issue presented, the federal court must determine what decision the state court would make if faced with the same facts and issue." Id. at 1206 (quotation marks omitted). Utah follows general principles of contract law, which we will apply

2008-1502                                6

here.  See Cent. Fla. Invs., Inc. v. Parkwest Assocs., 40 P.3d 599, 605 (Utah 2002).

Under Utah law, "we first look to the plain language within the four corners of the

agreement to determine the intentions of the parties, and we attempt to harmonize the

provisions in the . . . agreement."  Id.  In addition, other courts have addressed the

scope of the right to "make, use, and sell" a product, and we will look to them to guide

our decision.

In Carey, the Court of Claims, one of our predecessor courts, whose decisions

bind us, see South Corp. v. United States, 690 F.2d 1368, 1370-71 (Fed. Cir. 1982),

held that a license to "produce, use, and sell" a product inherently includes the right to

have it made by a third party.  The court stated that a license to produce, use, and sell

"is not restricted to production by the licensee personally or use by him personally or

sales by him personally.  It permits him to employ others to assist him in the production,

and in the use and in the sale of the invention.  Nor need he take any personal part in

the production."  Carey, 326 F.2d at 979.  Thus, "his license permits him to engage

others to do all the work connected with the production of the article for him."  Id.; see

also Advanced Micro, 885 P.2d at 1009 n.15 ("'[H]ave-made' rights—the right of a

licensee to have a chip made for it by a third party foundry—were not expressly

excluded under the 1982 contract, and in the absence of any finding by the arbitrator we

cannot say they were not included in the contractual right to make and sell a licensed

product.").  Thus, one of our predecessor courts and the California Supreme Court have

both persuasively held that a "have made" right is implicit in a right to make, use, and

sell, absent an express contrary intent.  We consider that the Utah Supreme Court

would therefore likely arrive at the same conclusion were it to consider the issue.

CoreBrace argues that the situation in Carey was different from the situation in this case because that license was exclusive and included a right to sublicense, which itself would inherently include a right to have the product made. We disagree. The court in Carey did not base its conclusion on exclusivity or the right to sublicense, but the right to "produce, use, and sell." The court specifically stated that "[a] licensee having the right to produce, use and sell might be interested only in using the article or in selling it; in order to use it or sell it, the article must be produced; to have it produced, his license permits him to engage others" to produce it for him. Carey, 326 F.2d at 979. None of that logic relies on the licensee's right to sublicense; in other words, a right to have made is not a sublicense, as the contractor who makes for the licensee does not receive a sublicense from the licensee. See Cyrix Corp. v. Intel Corp., 77 F.3d 1381, 1387-88 (holding that Cyrix's exercise of its expressly granted "have made" rights did not amount to a sublicense). The contractor cannot make or use for anyone other than the licensee or sell to third parties. Similarly, regarding the distinction between having an exclusive and nonexclusive license, a nonexclusive licensee who could make, use, and sell would still be entitled to have a product made for itself by another party in order to use or sell the product without making it, even if the patent owner granted other licenses. The distinction between an exclusive license and a nonexclusive license has no relevance to how a licensee obtains the product it is entitled to make, use, and sell. Thus, the logic of the holding in Carey is not limited to exclusive licenses or licenses that include a right to sublicense.

We also agree with Star that Intel is inapposite to this case. Intel was a special facts case. There, Intel sued Atmel for patent infringement, as Atmel was using Sanyo,

a licensee, as a foundry for an allegedly infringing product of Atmel's design, i.e., Atmel had Sanyo manufacture the product, and Atmel sold it under Atmel's own name. Atmel argued that Intel's license to Sanyo included foundry rights, which would have allowed Atmel to sell the licensed product under its own name because it was manufactured by Sanyo. Intel, 946 F.2d at 826. Thus, the sole issue was whether the license to Sanyo granted such foundry rights. In determining that Sanyo did not have the right under the license to act as a foundry, we discussed two provisions of the license, a reservation of rights clause and Intel's grant to Sanyo of the right to make, use, and sell only "Sanyo" products. Id. at 826 n.9. We determined that Sanyo had no foundry rights under the contract, holding that the addition of the word "Sanyo" to limit the products covered under the license was intended to exclude foundry rights. Id. at 826-28. Otherwise, it would be tantamount to granting Sanyo a right to sublicense, a right it did not have. All Sanyo had was the right to manufacture for its own purposes.

In determining that the "Sanyo" limitation excluded foundry rights, we addressed "have made" rights. Unlike in this case, both parties in Intel agreed that Sanyo's license excluded "have made" rights. Id. at 287. However, the parties disputed the textual source for such exclusion: whether it was the "Sanyo" limitation or the reservation of rights clause. Atmel argued that the "Sanyo" limitation was intended to exclude only "have made" rights, rather than foundry rights. Id. The administrative law judge of the International Trade Commission found that "have made" rights were excluded, not because of the "Sanyo" limitation, but because of the reservation of rights clause. Id. at 827-28. After first acknowledging the administrative law judge's reasoning, we stated another reason for denying "have made" rights, viz., that "have made" rights were also

precluded by the "Sanyo" limitation, as were foundry rights. Id. at 828. Thus, we did not base our holding in Intel on a determination that the reservation of rights clause precluded "have made" rights, but instead on a determination that the entire contract, including the "Sanyo" limitation, precluded "have made" rights. Because Intel was a case about foundry rights, rather than "have made" rights, and because our holding relied on the "Sanyo" limitation, we do not find Intel persuasive or controlling in this case. Instead, the Carey holding and reasoning control here.

CoreBrace argues that the reservation of rights clause in the License precludes an interpretation that the License includes "have made" rights. According to CoreBrace, because the License reserves to CoreBrace "[r]ights not expressly granted to [Star]," the License could not have implicitly granted "have made" rights to Star. We disagree. Because the right to "make, use, and sell" a product inherently includes the right to have it made, "have made" rights are included in the License and not excluded by the reservation of rights clause. A grant of a right to "make, use, and sell" a product, without more, inherently includes a right to have a third party make the product. A clear intent shown in a contract to exclude "have made" rights can negate what would otherwise be inherent. In this case, however, CoreBrace has failed to show a clear intent to exclude "have made" rights from the License. In fact, other provisions of the License appear to contemplate that Star may have the product made by a third party. For example, the License provides that Star owns any improvements to the technology "by a third party whose services have been contracted by [Star]." Although, as CoreBrace argues, that third party might be other than a manufacturer, nothing in the License precludes it from being a third-party manufacturer. In fact, a likely party to

improve the licensed technology is the manufacturer, so a third party who improves the technology is likely to be a third-party manufacturer. Similarly, the License requires Star to allow an "audit of its books and records relating to manufacturing . . . [and] supply contracts." Those provisions indicate that the parties contemplated that third parties might manufacture the licensed products and supply them to Star.

Most importantly, nothing in the License indicates an intent to exclude "have made" rights. CoreBrace argues that the License's provision requiring Star to indemnify CoreBrace for all claims "arising out of [Star's] manufacture" demonstrates an intent that no third party manufacture the products. According to CoreBrace, if "have made" rights had been intended, the License would have required indemnification for all claims arising out of third parties' manufacture as well. However, that vague reference does not show a clear intent to exclude "have made" rights, especially in light of the provisions indicating that third parties might be involved in supplying goods and improving the technology in order for Star to exercise its rights under the License. CoreBrace has not pointed to any provision in the License that shows a clear intent to exclude "have made" rights from its grant.

We therefore hold that Star did not breach the License by contracting with third parties to have the licensed products made for its own use. As for CoreBrace's argument that the district court erred in holding that CoreBrace had failed to adequately terminate the License, the issue is moot because the license was not breached. CoreBrace was not entitled to terminate the license, and thus the License has not been terminated. Thus, Star cannot have infringed CoreBrace's patent under which it was licensed.

We have considered CoreBrace's remaining arguments and find them unpersuasive.

## CONCLUSION

Accordingly, the judgment of the district court dismissing the case for failure to state a claim is affirmed.

<u>AFFIRMED</u>